IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:16-CV-906-BO

KATHY LIVINGSTON, as Administratrix )
of The Estate of John David Livingston, II, )
*et al.*, )
                                        )
            Plaintiffs,                 )
                                        )
v.                                      )            O R D E R
                                        )
NICHOLAS KEHAGIAS, both individually )
and in his official capacity as law       )
enforcement officer with the Harnett County )
Sheriff's Department, *et al.*,           )
                                        )
            Defendants.                 )

This cause comes before the Court on defendants' motion for summary judgment pursuant

to Rule 56 of the Federal Rules of Civil Procedure. Plaintiffs have responded, defendants have

replied, and the matter is ripe for ruling. For the reasons that follow, defendants' motion is denied.

## BACKGROUND

This case was brought by six plaintiffs against four deputy sheriffs and two sheriffs of

Harnett County, North Carolina. Each plaintiff alleges that one or more of the deputy defendants

used excessive force against him or her and that the deputies executed their duties in a grossly

negligent manner. Plaintiffs allege that the Sheriff's Office, under the leadership of Sheriffs

Rollins and Coats, has a long and disturbing history of police misconduct and that the Office

leadership has either condoned or turned a blind eye to misconduct by their deputies. The specific

complained-of incidents took place between January 1, 2015, and November 15, 2015.

Except as otherwise noted, the following recitations of events are comprised of the undisputed facts from the parties' Local Rule 56.1 statements. *See* [DE 93; 110]. Other than those facts which are undisputed, the plaintiffs' and defendants' versions of events are in stark contrast, with defendants disputing much of what plaintiffs contend occurred.

*Plaintiff Christine Broom; January 1, 2015.*

Plaintiff Christine Broom rents a room in her home to Thomas Corley, who has been her tenant for about five years. While they did not have a written lease agreement, they had an unwritten agreement that Corley was not supposed to come to Broom's home while intoxicated or on drugs. Harnett County Sheriff's Deputies, including defendant Klingman, had responded to calls at Broom's home related to Corely and their agreement prior to January 1, 2015.

On January 1, 2015, Broom locked Corely out of the home and Corely called 911 that afternoon for assistance. Broom assumed that law enforcement would make Corely "sleep it off somewhere" or "take him in" because he was intoxicated. Harnett County Sheriff's Corporal Paul Phillips was the first to arrive at Broom's home after the 911 call and defendant Klingman arrived approximately 10 minutes later while Corely and Corporal Phillips were on Broom's back porch. Klingman and Phillips advised Corely that he could not be criminally charged for breaking into his own residence.

While Corely attempted to pry the backdoor open using a screwdriver and a crowbar with Phillips' assistance, Broom stated to Phillips from inside the house that Corely did live in the house but that she did not want him there because he was on alcohol and cocaine, and advised that she was scared for her life. Corely and Klingman then walked to the front of the house where Klingman held the screened-door open while Corley used his shoulder to ram the front door open. Klingman followed Corely inside and opened the backdoor to let Phillips into the house. Klingman

handcuffed Broom, but the handcuffs came off of Broom's wrist. Broom was then charged with resisting, delaying, and obstructing an investigation,[1] and the charge was later dismissed.

Plaintiffs contend that Klingman and Phillips told Corley that they needed Corley to break the door down so that they could arrest Broom. Corley Dep. at 56-58. Specifically, Corley recalled the January 1, 2015, incident, as recorded in his statement given on January 15, 2015, as follows:

On January 1st, 2015, I, Thomas Corley, returned to the house of Christine Broom from whom I rent from. I found the doors locked. I was high on cocaine, and I knew I wasn't allowed in as we have a verbal agreement that I am to be sober at her house as a condition for living there. I called 911 and the dispatcher told me the sheriff was on the way, and that I can knock down the door. When the sheriff got there, he asked if anyone was home. I said Christine was. Her -- her car and her daughter's car was in the driveway. He knocked hard on the front door and told her to open up. There was no answer. He told me then that the only way to get in was to knock down the door. I tried pushing it in. Then Sheriff Phillips tried, but it didn't open. Sheriff Phillips then told me we needed to go in through the back door. He told me to jump over the fence and Christine's – Christine's dog in the shed -- put Christine's dog in the shed or he would have to shoot it. I did as he ordered. I opened the gate for them -- opened the gate for them. Then I told the sheriff I didn't have to break the French doors, which are very expensive. He told me to use something on it. I got a crowbar and tried to open the door. The sheriff was pushing on it. He told me to get a flathead screwdriver. I heard the door crack as he pushed on it. I stopped, and I didn't want him to break it. I told him there was no need for force. He said he wasn't leaving until he got in there because he was going to arrest her, that I needed to break down the door. I told him I would rather break the front door. So Deputy Klingman and I went to the front door. Sheriff Phillips stayed at the back door. I tried kicking the front door in, but it wouldn't budge. Deputy Klingman told me to push with my shoulder putting my weight into it while he held the screwdriver -- the screen door open. As I -- as soon as I knocked open the door, Deputy Klingman followed me in and ran and unlocked the back door. Deputy Phillips then told Christine she was under arrest even though I said I wasn't pressing any charges. He told Deputy Klingman to cuff her, and she was taken to the station. Her daughter and I bailed her out."

[DE 112-40] Corley Dep. at 56-58.

---

[1] N.C. Gen. Stat. § 14-223 makes it a Class 2 misdemeanor to willfully and unlawfully resist, delay, or obstruct a public officer in the discharge or in attempting to discharge his duties. This charge shall be referred to herein as "resist, delay, obstruct" or alternatively as RDO.

*Plaintiff Michael Cardwell; May 12, 2015.*

On May 11, 2015, at approximately 11:45 p.m. plaintiff Cardwell, who was then sixty-five years old, called 911 and told the operator that he needed help and needed to initiate an arrest report. Cardwell had made several 911 and veterans' hotline calls that evening and called 911 again shortly after midnight. Defendants Kehagias and Klingman responded in uniform to Cardwell's residence and when they arrived Cardwell was standing in his driveway at the back of his truck, leaning against the tailgate. Cardwell asked the deputies to turn on the video recording devices in their vehicles, to which Kehagias responded "We don't got no video." Cardwell then asked if the deputies were veterans, to which they responded "no." Upon hearing that the deputies were not veterans, Cardwell picked up a beer, turned around, and threw it at the back of his truck. Cardwell then turned back to the deputies and gave them a speech about his frustration with the Department of Veterans Affairs, during which he was pacing back and forth while he talked and gesticulating with his hands. Kehagias then took Cardwell to the ground and used OC, or pepper, spray[2] on Cardwell while he was on the ground.

After Cardwell was handcuffed, the deputies moved him to a chair in the driveway. The deputies then requested assistance from Emergency Medical Services (EMS) for Cardwell's leg pain and for OC spray decontamination. The paramedic advised that it would be in Cardwell's best interest to be transported to the hospital and Cardwell agreed to go to the hospital. Cardwell was admitted to Central Harnett Hospital at 2:10 a.m. with a blood alcohol concentration of 122mg/dL or .12 BAC. Cardwell was charged with resist, delay, or obstruct, and the charge was later dismissed. Cardwell Dep. at 174.

---

[2] The record refers to both OC and pepper spray throughout.

4

Cardwell contends that he never told 911 dispatchers that he was suicidal, and is confident defendants Kehagias, Klingman, and Knight were the three deputies who arrived at his home during the night in question. Cardwell recalls that as the three deputies stood in his driveway, not speaking and not approaching him, he asked for their names, to which Klingman responded "Donald Duck." [DE 95-3] Cardwell Dep. at 123, 125. After Cardwell began giving his "speech" about his military service heritage, Kehagias inched his way toward Cardwell and, without warning, "rushed [him] like a linebacker" and immobilized Cardwell. *Id.* at 128. Kehagias got Cardwell's hand over his head and Klingman began pepper-spraying Cardwell. *Id.* Cardwell testified as follows at his deposition:

> Now, I didn't know anything that was happening after my hand was up like this, (demonstrating) because I was blinded. And he continuously sprayed that stuff on me, emptied the can. It wasn't only in my eyes. The first little squirt got that. It was concentrated around my nose, my mouth. And I'm trying to breathe, man. I said, "Man, please, I'm trying to breathe." And -- but it's to no avail. The can is still going like this, and I'm not -- I'm like -- I was like a rag doll. I said that -- that I couldn't breathe. That's one thing I said. And then I said, "Sir, I can't walk." And that's the only thing that I said -- during the whole thing when it happened. But my -- my leg was broken instantly. And I don't know if he did some kind of fancy move or whatever, but I was up off my feet, slammed on the ground. And I guess it was his knee. Something come down on me and broke my rib and my -- but I -- I didn't know that until I got in the hospital. The adrenaline was flowing in me like I don't know if I'm going to survive this or not. Because I don't know what they're going to do next. I'm not talking. And, sir, when I said I couldn't walk, "I can't walk, sir," the second time, when he jerked me up, now they put me in the chair, there wasn't a word said. It was deathly silent.

*Id.* at 129-130.

Cardwell testified that as he was lying on the ground handcuffed, Kehagias still spraying him while his knee was pressed into Cardwell's back and Cardwell's face was being ground into the pavement. *Id* at 139. Kehagias admitted at his deposition that he pepper-sprayed Cardwell when Cardwell was handcuffed and sitting in the chair. [DE 112-66] Kehagias Dep. at 479-80. Kehagias contends that Cardwell was spitting on him and that he used pepper spray while Cardwell

5

was fully restrained so that he would not have to use more physical force on him. *Id.* Cardwell contends that he did not spit on any of the deputies and that he was trying to breathe after having a can of pepper-spray emptied in his face. Cardwell Dep. at 132. Cardwell's medical record from the hospital reveals that he was alert, not clinically intoxicated, and that he sustained an intertrochanteric fracture of the left femur with mild separation of the fracture fragments as well as a rib fracture. [DE 96-18].

*Plaintiffs Tyrone Bethune and Ryan Holloway; July 30, 2015.*

On July 30, 2015, defendant Kehagias was attempting to serve a warrant on Robert Cox with Deputies Thomas and Werbelow assisting. Robert Cox, an African American male, resided at 1914 Rosser Pittman Road. The addresses on Rosser Pittman Road are confusing, and the deputies went to 1982 Rosser Pittman Road, plaintiff Bethune's residence. The deputies arrived at Bethune's residence at approximately 2:30 a.m. Werbelow drove around to a dirt path in an attempt to get to the back of the residence but was caught in a briar thicket. Kehagias knocked on the front door of the residence and said "open the door, Harnett County Sheriff." Bethune responded through the closed door and asked why he needed to open the door; Kehagias stated that a call had come in from that residence that someone was trying to kill themselves. Bethune and Holloway responded that they knew that was not true. Kehagias asked if Robert Cox was there and which of the two men was Robert Cox. Bethune and Holloway responded that neither were Robert Cox, that Cox lived at 1914 Rosser Pittman Road, and the deputies had the wrong address.

After some discussion, Holloway walked outside to show Kehagias that he was not Robert Cox. Holloway then went back inside and Kehagias followed behind him through the door. Bethune asked Kehagias if he had a warrant to enter the home, Kehagias responded "no," and

6

Bethune told Kehagias to get out. Kehagias grabbed Holloway by the arm and pulled him out of the house and handcuffed him. Bethune started to use his phone to video the incident, and Kehagias grabbed Bethune by his arm and pulled him outside. Kehagias then pushed Bethune up against the side of the house, grabbed his chest, and took Bethune down to the ground and handcuffed him. Bethune's tooth was chipped during the takedown. Bethune concedes that he had a warrant for his arrest at the time of the incident. Bethune was transported to the Sheriff's Office on the warrant and Holloway was released from handcuffs and allowed to leave.

Bethune and Holloway have testified that, after he followed Holloway into the house, Kehagias told Bethune that Holloway had given him permission to search, which Holloway promptly denied having done. *See* [DE 112-41] Bethune Dep. at 50. Bethune has further testified that, prior to his being body-slammed to the ground and handcuffed, he retrieved paperwork from his car to show the deputies proof of his identity that reflected that his name is King Knowledge-El, and that the deputies were unaware of his name Tyrone Bethune until after he was handcuffed and put in the back of the patrol vehicle. *Id.* at 141-43.

> Bethune describes his encounter with Kehagias as involving the following:

> and I'm trying to film with my little phone, I'm trying to film. And they see I'm still trying to film, so I get slammed to the ground. Then they're telling me, "Stop resisting. Stop resisting. Stop resisting." Well, I'm not resisting. . . . Like I was a participant in the WWE. I'm not a wrestler. My physique doesn't say that I'm a wrestler, or bodybuilder, or some weight trainer, or anything of that nature. . . . I got slammed to the ground face first, so my tooth got chipped.

*Id.* at 91; 96-97.

*Plaintiff Wesley Wright; September 15, 2015.*

In September 2015, plaintiff Wright and Donnie Scott were living together as a couple and had been in a seventeen-year relationship. In the past, Scott had taken out assault and battery charges against Wright and law enforcement had been called to their home on at least several

7

occasions. On September 15, 2015, Wright and Scott hosted a party to celebrate their birthdays. During the party, Scott called 911 and reported that he may need to get a restraining order against Wright. Defendant Kehagias was dispatched to the party on a domestic disturbance call; Kehagias had no prior knowledge of or experience with Wright or Scott. Kehagias arrived at the home, and the facts regarding the incident are in dispute. At the conclusion of the incident Kehagias charged Wright with resisting, delaying, and obstructing his investigation of the domestic disturbance call. The charge was later dismissed.

The Computer Assisted Dispatch (CAD) report of Scott's 911 call indicates that no known weapons were involved, that the suspect, Wright, did not have access to weapons, and that the incident involved a verbal disturbance. [DE 112-1]. Scott testified that when Kehagias responded to the 911 call, he spoke to Scott and Scott told Kehagias that everything was fine and that Wright had calmed down and was inside watching television. [DE 112-38] Scott, Dep. at 40. Scott testified that while he was speaking to Kehagias, Wright came out on to the porch and said "oh, you black bastard," and went back into the house and locked the door. Kehagias jumped out of his car and ran to the side of the house and banged on a window demanding that someone open the door. Kehagias then asked Scott if he had a key to the door, which Scott did, and Kehagias ordered Scott to open the door; another individual by the name of Wallace Hawthorne was also inside the home at that time, and he unlocked the door before Scott could open it. Once the door was unlocked, Kehagias pushed the door open, went into the house, pulled his gun, and found Wright sitting on a chair with his dogs. *Id.* at 40-41; 69. Wright describes his encounter with defendant Kehagias as follows:

He grabbed me, slammed me against the door, you know. I'm like, "Hold on. What are you doing?" You know what I'm saying? What you locking me up for?" "Why -- why is you doing this?" He's telling me, "Shut the F up. Shut the F up." Hit me in my wrist. Pow. Slam another part of the door, open the door, and I got a

8

refrigerator on my porch. So then he -- he grabbed me then, slammed me into the refrigerator, put the handcuffs on me, jacked my arms all the way back up. You know what I'm saying? "You're resisting." "How am I seeing resisting? What the hell is you locking me up for?" . . . I'm not cursing at him, but I'm trying to ask him, "Okay. What is you locking me up for?" He slammed me down because -- we got a wheelchair ramp, and we got steps on this side. So he's banging me from side to side with the handcuffs on, kicking my feet when I'm trying to walk. You know what I'm saying? I'm like, "Man, look, y'all need to see and call somebody. What y'all locking me up for?" He kept telling me, "Shut the hell up. Shut the hell up." Walked me over to -- when you come down -- the driveway's right here (indicating). He took my face first in handcuffs slamming on the car. Pow. I said, "Man, you can't do this." And so he picked me up, and he slammed me again on my neck. That – that's what tore my back up more. . . . I'm like, "Man, you can't be doing this." I said, "What is you locking me up for?" "Stop. You're resisting." I said, "How am I resisting? I'm in my handcuffs," you know. So he was like, "Shut up." Boom. Kicked me in the back. Then he knees – kept kneeing me in the back of the head. All of sudden, he grabbed his mace. He grabbed his mace, sprayed me in the eyes. I'm like, "Ahh." He maced me. I'm like -- you know what I'm saying? I'm like, "I can't see. I can't see." . . . So he asked the next deputy for his can of mace and kept macing me and kept macing me while I'm on the ground. My family coming around, telling them all, "Get off of him. Get off of him." . . . So he beat me from the car all the way back to the middle of the yard. And I'm – I'm still screaming. I'm screaming. He had hit me with two cans of mace. All of a sudden, they was like, "Get the water hose," or whatever else was – somebody was telling him something. So they wet my whole body down with the water hose, took it on high beam. Shot me all into my eyes, my face. I'm bruised up. You know what I'm saying? Face full of dirt. And he's still beating. All of a sudden, after I'm nice and wet and everything else, he came back, slammed me in the car, pulled off.

[DE 112-37] Wright Dep. at 39-41.

*Plaintiff Estate of John Livingston; November 15, 2015.*

John Livingston was shot and killed by defendant Kehagias during the early morning hours of November 15, 2015, at his home at 172 West Everett Street in Spring Lake, North Carolina. Defendants Kehagias and Werbelow arrived at Livingston's home at approximately 3:40 a.m. on November 15, 2015, and Werbelow walked around to the back of the house while Kehagias walked to the front door and knocked. Livingston answered the door, whereupon Kehagias asked if Lonnie Setzer was in the home. Lonnie Setzer was not in the house, but three other individuals were present: Bristol Edge, Bradley Timmerman, and Clayton Carroll. Livingston asked Kehagias if he

9

had a warrant to enter the home, to which Kehagias responded "no." Livingston then attempted to close the door and walked to a chair in the living room and sat down. Kehagias entered the house, pushed Livingston to the wall, and Livingston was subsequently on the ground on his stomach with Kehagias on top of him. Kehagias then tased and pepper-sprayed Livingston while attempting to get control of Livingston's arms to put him in handcuffs. Livingston and Kehagias were wrestling and, when the two made it halfway to the doorway, Kehagias put a gun to Livingston's head. According to witnesses Carroll and Timmerman, Kehagias threatened to kill Livingston if Livingston did not give Kehagias his hands. Kehagias re-holstered his gun and drew his taser a second time. Werbelow then pepper-sprayed Livingston briefly and the deputies were able to get one handcuff onto Livingston. Kehagias then tased Livingston again and Werbelow pepper-sprayed him again. Livingston and Kehagias then moved out onto the front porch. At some point during the encounter on the porch Kehagias lost control of the taser. Kehagias yelled "he's got my taser," but witness Carroll stated that Livingston did not have control of the Taser.

Carroll recalls the events leading to Livingston's death as follows:

They asked for Lonnie Setzer. And he said, "Lonnie don't live here." They was like, "Well, do you mind if we come in to see?" He was like, "Do you have a search warrant to come in?" And they was like, "No, but we believe Lonnie Setzer's here." And he was like, "Well, when you get a" – "You -- you can't search the house unless you have a search warrant." And he was like, "We got to go to work in the morning, so good night." And he shut the door. And then he went and sat down on the couch. Well, I heard the door go "boomp, boomp" where it got kicked, and then it hit the wall. And then I looked up. The officer went and grabbed John by the arm and said, "You want to be a smartass?" He was like, "This is what happens to smartasses." And he pulled him up off the seat. He was like, "Why are you doing this?" He was like, "I hadn't done" – "You're not supposed to be in the house." He said, "Get your hands behind your back. You're under arrest." He was like, "For what?" He was like, "I ain't putting my hands behind my back." So he pulled out the Taser and – and shot John with it in the rib cage by the TV over here. And it kind of made John's legs get weak, and he started stumbling toward the kitchen where the steps were and to the tile, and then that's where he fell. He fell onto them steps. And his head was up on the tiles. And Kehagias got on the back of him, straddled his back. And he had his -- John had his arms up underneath him, like this

10

right here (demonstrating), so he wouldn't -- John had his arms up underneath his -- his chest so they couldn't get his arms. And they was like, "Give me your arms. Quit resisting." He was like, "I ain't done nothing wrong. Why do I got to give you my arms?" And then they started elbowing him in the head, and his head would hit the tile. His face started bleeding. And then they kept on doing that to him, trying to get his arms. So he -- when he felt like he had a little room, he tried to roll when he was going to run out the door to get away, and they jumped on top of him again, and his face hit the threshold of the door. And he put his hands up underneath him again. They -- he wouldn't give them his hands. So Kehagias pulled out a gun and said, "If you don't stop resisting, I'm going to blow your fucking brains out." And he still wouldn't give him his hands. So he reholstered the gun and pulled out the Taser again and started tasing him. Well, wouldn't -- they still wasn't getting his arms. So he -- he told Werbelow to -- to "Punch him in his fucking face." Werbelow, he didn't want to do it. He was -- he acted kind of wary. He acted like he was going to do it, and then he wouldn't do it. And then he was like, "Oh, well, fucking spray him." And so Werbelow reached down there and sprayed kind of upwards into his face. And he was like, "Pull him outside. Pull him outside." So Werbelow grabbed him by his -- his -- kind of like his hair and his beard and pulled him while Kehagias was straddling over his back, walking him -- kind of duckwalking him out. And he was still on his back. And he still was trying to put his arms up underneath . . . And he laid down on top of him, pressed him down to the ground, and was kneeing and kicking him and -- and trying to get his hands. He still wouldn't get it. So he started tasing him again. And John -- I remember John saying (descriptive sound) and reached back to get the Taser off of him. And the Taser started rapidly going off (demonstrating). I guess from both of their hands on it, they got tangled in it somehow or another. And Kehagias rolled off of him and put his back toward -- against the thing that-- the wrap-around seats, put his back up against it and started firing. . ..

[DE 112-49] Carroll Dep. at 45-48; 125. Carroll does not believe there was any way that Kehagias could have been hit by the taser, that Livingston only tried to get the taser off of himself, and that it was never pressed on to Kehagias. *Id.* at 177-178.

Each plaintiff alleges that the particular defendants involved in their complained-of incident violated their rights to be free from: unreasonable searches and seizures; unreasonable force; unlawful, reckless, deliberately indifferent, and conscience shocking deadly and/or excessive force in violation of the Fourth and Fourteenth Amendments; malicious prosecution as secured by the Fifth and Fourteenth Amendments; and deprivation of liberty and injury without substantive due process and from state created danger as secured by the Fourteenth Amendment.

11

[DE 59; 71]. Plaintiffs have also alleged official capacity claims against the Harnett County Sheriff's Office for a policy or custom that inflicts injury upon a citizen as well as a failure to train, supervise, and/or discipline its deputies. The plaintiffs further allege state law claims for negligence/wrongful death, trespass, civil conspiracy by Cardwell, assault and battery, false imprisonment, and malicious prosecution.

## DISCUSSION

Defendants have moved for entry of summary judgment in their favor on all claims. A motion for summary judgment may not be granted unless there are no genuine issues of material fact for trial and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). In determining whether a genuine issue of material fact exists for trial, a trial court views the evidence and the inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, "[t]he mere existence of a scintilla of evidence" in support of the nonmoving party's position is not sufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party. . . . and [a] fact is material if it might affect the outcome of the suit under the governing law." *Libertarian Party of Virginia v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (internal quotations and citations omitted). Speculative or conclusory allegations will not suffice. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002).

12

<u>Individual capacity § 1983 claims and qualified immunity</u>

Defendants Kehagias, Klingman, Knight, and Werbelow have raised the defense of qualified immunity. Qualified immunity shields government officials from liability so long as they can reasonably believe that their conduct does not violate clearly established law. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). It protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *see also Reichle v. Howards*, 566 U.S. 658, 664 (2012). A court employs a two-step procedure for determining whether qualified immunity applies that "asks first whether a constitutional violation occurred and second whether the right violated was clearly established." *Melgar v. Greene*, 593 F.3d 348, 353 (4th Cir. 2010) (citing *Saucier v. Katz*, 533 U.S. 194 (2001)). A court may exercise its discretion to decide which prong of the analysis to decide first based on the circumstances presented. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Where qualified immunity has been raised, viewing the facts and drawing the reasonable inferences in the light most favorable to the plaintiff generally means adopting the plaintiff's version of the facts. *Scott*, 550 U.S. at 127; *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008); *see also Hensley on behalf of N. Carolina v. Price*, 876 F.3d 573, 579 (4th Cir. 2017) (court must "take the facts in the light most favorable to the plaintiffs to determine the applicable questions of law and ignore any contrary factual claims."). A court "do[es] not make credibility determinations in resolving the first prong of the *Saucier* analysis." *Wilson v. Prince George's Cty., Maryland*, __ F.3d __, 2018 WL 3015045, at *4 (4th Cir. June 18, 2018). The determination of whether a right is clearly established is a legal question always answerable at summary judgment, but where there are issues of fact with respect to the officer's conduct or its reasonableness, summary judgment is

13

inappropriate. *Pritchett v. Alford*, 973 F.2d 307, 313 (4th Cir. 1992); *see also Willingham v. Crooke*, 412 F.3d 553, 559 (4th Cir. 2005) (internal alteration and citation omitted) ("a genuine question of material fact 'regarding whether the conduct allegedly violative of the right actually occurred' must be reserved for trial.").

I. Violation of constitutional rights.

A claim for violation of a constitutionally protected right under 42 U.S.C. § 1983 requires a plaintiff to allege "that some person has deprived him of a federal right . . . [and] that the person who has deprived him of that right acted under color of state or territorial law." *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). The Fourth Amendment provides in relevant part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV.

A. Unreasonable seizure and false arrest.

"The Fourth Amendment prohibits law enforcement officers from making unreasonable seizures, and seizure of an individual effected without probable cause is unreasonable." *Brooks v. City of Winston-Salem, N.C.*, 85 F.3d 178, 183 (4th Cir. 1996). Probable cause is a result of a practical, common-sense consideration of all of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *Smith v. Munday*, 848 F.3d 248, 253 (4th Cir. 2017). Probable cause "requires more than a bare suspicion" but less than evidence sufficient to convict. *Munday*, 848 F.3d at 253 (quoting *United States v. Gray*, 137 F.3d 765, 769 (4th Cir. 1998)). Only those facts and circumstances known to the officer at the time of the arrest are to be considered when determining whether probable causes existed. *Wilson v. Kittoe*, 337 F.3d 392, 398 (4th Cir. 2003).

A claim for false arrest is properly analyzed as a claim for an unreasonable seizure under the Fourth Amendment, and requires the plaintiff to show that he or she was arrested without

14

probable cause. *Brown v. Gilmore*, 278 F.3d 362, 367 (4th Cir. 2002). Section 1983 malicious

prosecution claims are also properly examined as claims founded on the Fourth Amendment. *See*

*Lambert v. Williams*, 223 F.3d 257, 262 (4th Cir. 2000) (noting "there is no such thing as a '§ 1983

malicious prosecution' claim."); *Gantt v. Whitaker*, 57 Fed. App'x 141 (4th Cir. 2002).

B. Warrantless entry of the home.

Searches and seizures inside a home are presumptively unreasonable without a warrant.

*Kentucky v. King*, 563 U.S. 452, 459 (2011) (citation omitted).

> Before agents of the government may invade the sanctity of the home, the burden
> is on the government to demonstrate exigent circumstances that overcome the
> presumption of unreasonableness that attaches to all warrantless home entries.
> When the government's interest is only to arrest for a minor offense, that
> presumption of unreasonableness is difficult to rebut, and the government usually
> should be allowed to make such arrests only with a warrant issued upon probable
> cause by a neutral and detached magistrate.

*Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984) (citing *Payton v. New York*, 445 U.S. 573, 586

(1980)). The exceptions to the warrant requirement are narrowly drawn, and include exigent

circumstances, *see, e.g., United States v. Turner*, 650 F.2d 526, 528 (4th Cir. 1981), and voluntary

consent. *See, e.g., Georgia v. Randolph*, 547 U.S. 103, 106 (2006). Instances where exigent

circumstances have been found to exist include when police "(1) have probable cause to believe

that evidence of illegal activity is present and (2) reasonably believe that evidence may be

destroyed or removed before they could obtain a warrant." *United States v. Cephas*, 254 F.3d 488,

494-95 (4th Cir. 2001). Exigent circumstances may also exist where there is a need to render

emergency assistance or protect an occupant from imminent injury, or where there is an imminent

risk that a suspect will escape. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). "[T]he

exigent circumstances rule applies when the police do not gain entry to premises by means of an

actual or threatened violation of the Fourth Amendment." *King*, 563 U.S. at 469.

While a suspect may not defeat an arrest has been set in motion in a public place by escaping to a private place, *United States v. Santana*, 427 U.S. 38, 43 (1976), this rule applies only where a true "hot pursuit" is involved; in other words, where a "suspect sees the police, and the authorities have a realistic expectation that any delay will result in the destruction of evidence, they may enter without a warrant to effect an arrest." *United States v. McCraw*, 920 F.2d 224, 229 (4th Cir. 1990) (citing *Santana*, 423 U.S. at 43)).

As noted above, consent to enter and search a home or to make an arrest may provide an exception to the general prohibition on warrantless entry. Consent must be voluntarily obtained, and must be given by either the individual whose property is being searched or by a third party who possess common authority over the premises. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). Where two or more people live in a home, "a physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant." *Randolph*, 547 U.S. at 122-23. Whether consent to search or enter is valid is based on the totality of the circumstances. *Trulock v. Freeh*, 275 F.3d 391, 401 (4th Cir. 2001).

C. Excessive force.

Law enforcement officers violate an individual's Fourth Amendment rights when they effect a seizure using excessive force. *Schultz v. Braga*, 455 F.3d 470, 476 (4th Cir. 2006). Whether an officer used excessive force to effect a seizure is analyzed under an objective reasonableness standard, without regard to the officer's subjective intention or motivation. *Id.* at 477; *see also Graham v. Connor*, 490 U.S. 386, 397 (1989) ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.).

16

A court does consider, however, the facts and circumstances confronting the officer, and it must focus its attention on the moment the force was employed. *Henry*, 652 F.3d at 531 (citations omitted). Specific factors to be considered are the severity of the crime at issue, whether the suspect poses an immediate threat, and whether the suspect is actively resisting or attempting to flee. *Graham*, 490 U.S. at 396. The Court may also consider the extent of the injuries suffered by the plaintiff in determining whether the force used was excessive. *Jones v. Buchanan*, 325 F.3d 520, 530 (4th Cir. 2003). "A police officer may use deadly force when the officer has sound reason to believe that a suspect poses a threat of serious physical harm to the officer or others." *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996) (citing *Tennessee v. Garner*, 471 U.S. 1 (1985)). Whether the officer's conduct was reasonable is a question of law to be decided after determining "the relevant set of facts and draw[ing] all inferences in favor of the nonmoving party to the extent supportable by the record." *Scott*, 550 U.S. at 381 n.8 (2007).

II. Clearly established constitutional rights.

Whether a right was clearly established must be particularized to the facts of the case and may not defined "at a high level of generality." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Courts "do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. Specificity is especially important in the context of the Fourth Amendment, and the relevant inquiry is whether it would be clear to a reasonable officer that his or her conduct was unlawful in the particular situation that he or she confronted. *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (citing *Saucier*, 533 U.S. at 202); *see also Wilson*, 2018 WL 3015045 *5.

III. Analysis.

Having considered the undisputed facts and the disputed facts in the light most favorable to plaintiffs, the record demonstrates that plaintiffs' constitutional rights were violated and that the rights violated were clearly established at the time of the incidents.

1. Christine Broom.

Plaintiff Broom's evidence sufficiently establishes for purposes of defendants' summary judgment motion that defendant Klingman unlawfully entered her home and arrested her. Taken in the light most favorable to Broom, Klingman ordered Broom's roommate to violate his agreement with Broom not to enter the home when he (Corley) was intoxicated, assisted Corley in breaking down the door, and then entered Broom's home without first obtaining a warrant or consent. Although defendants have argued that, upon Corley's entry into the home, there were exigent circumstances due to the fact that there was a domestic dispute then in progress, "[a]ny warrantless entry based on exigent circumstances must, of course, be supported by a genuine exigency", and law enforcement officers may not by their own conduct create the exigency which is then relied upon to support their warrantless entry. *King*, 563 U.S. at 470. In other words, where Klingman and Phillips assisted Corley in breaking into the residence, they cannot then rely on their belief that his presence in the residence could pose a threat of immediate injury to justify their warrantless entry.

Absent any justification, defendant Klingman's entry into Broom's home and subsequent arrest and seizure of Broom violated Broom's Fourth Amendment rights. Defendants argue that Klingman's "use of handcuffs was []'reasonably necessary to maintain the status quo and protect [officer] safety during an investigative stop.'" *United States v. Crittendon*, 883 F.2d 326, 329 (4th Cir. 1989) (quoting *United States v. Taylor*, 857 F.2d 210, 213 (4th Cir.1988)). None of the cases

cited by defendants which concern the validity of a reasonable brief investigatory detention involve an individual in their home, but rather each involve automobile or on-the-street scenarios, which differ drastically from the sanctity of the home for Fourth Amendment purposes. *See, e.g., State v. Carrouthers*, 200 N.C. App. 415, 417 (2009) (investigatory stop in convenience store parking lot); *State v. Campbell*, 188 N.C. App. 701, 702 (2008) (investigatory stop at top of highway on-ramp); *see also United States v. Saari*, 272 F.3d 804, 809 (6th Cir. 2001) ("It would defy reason to hold . . . that a warrantless in-home seizure is authorized to further an investigation, but that either a warrant or exigent circumstances are necessary when officers have the probable cause and intent to arrest). Moreover, a brief investigatory detention must be supported by a reasonable articulable suspicion that a crime is afoot. *Turmon v. Jordan*, 405 F.3d 202, 205 (4th Cir. 2005) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). It is not clear what crime the defendant Klingman or Corporal Phillips may have believed that Broom had committed when Klingman handcuffed her, as they argue that the basis for the resist, delay, and obstruct charge arose *after* the handcuff slipped or was taken off of Broom's wrist. *See* [DE 100 at 23].

Defendants argue further that it was reasonable for Klingman to believe he had legal grounds to arrest Broom for the misdemeanor offense of resisting, delaying, or obstruction after the handcuff slipped off of her wrist. *See* N.C. Gen. Stat. § 14-223. "Under the Fourth Amendment, a warrantless arrest is an unreasonable seizure unless there is probable cause to believe that a criminal offense has been or is being committed." *United States v. Johnson*, 599 F.3d 339, 346 (4th Cir. 2010); *see also Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). Because Klingman cannot show that he had authority to hand-cuff Broom in her own home in order to "preserve the status quo," his justification for arresting Broom for resist, delay, and obstruct when the handcuff came off of her wrist also fails. Further, Broom testified that Klingman immediately

19

put her in handcuffs when he entered after Corely broke through the front door, and thus any event which occurred after that cannot form the basis of the charge. Defendants have failed to show that based on the circumstances a prudent person would believe that Broom had committed a crime, and cannot establish that Klingman had probable cause to effect a warrantless arrest.

Defendants' argument that the rights Broom alleges were violated were not clearly established is unpersuasive. While the Court is mindful that this prong of the analysis cannot rest on generalities, defendants have come forward with no persuasive argument that the defendant Klingman's actions involving Broom involved anything more than basic Fourth Amendment principles. In short, viewing the facts in the light most favorable to Broom, defendant Klingman violated Broom's clearly established Fourth Amendment rights and he is not entitled to qualified immunity.

2. Michael Cardwell.

Plaintiff Cardwell contends that defendants Kehagias, Klingman, and Knight unreasonably arrested him for a mental health evaluation. Probable cause is required in order to effect a seizure of an individual for a mental health evaluation, and probable cause in this type of circumstance requires that the facts and circumstances known to the officers were sufficient such that a prudent man would believe that the individual posed a danger to himself or others. *Cloaninger ex rel. Estate of Cloaninger v. McDevitt*, 555 F.3d 324, 334 (4th Cir. 2009). "[T]he general right to be free from seizure unless probable cause exists [i]s clearly established in the mental health seizure context." *Gooden v. Howard Cty., Md.*, 954 F.2d 960, 968 (4th Cir. 1992). "Probable cause, of course, is a 'fluid concept that cannot be reduced to a neat set of legal rules,' and our cases applying the concept in the mental-health context are perhaps not easily reduced to bright-line rules." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 170 (4th Cir. 2016) (citation omitted).

Additionally, even if the seizure of Cardwell for mental health purposes is found to be reasonable, Cardwell contends that excessive force was used to effect his seizure.

The evidence in the light most favorable to Cardwell reflects that, although the 911 CAD report shows that the dispatcher believed Cardwell may have attempted suicide, it also states that Cardwell just needed someone to talk to. [DE 94-4] Raynor Aff. Ex. O. Cardwell has testified that the deputies were rude and unresponsive when he asked their names and whether or not they were veterans. It is undisputed that Cardwell did not display a weapon, and that, although Cardwell threw a beer can, he threw it away from the deputies and toward his truck. Defendants acknowledge that a 911 call reporting suicidal behavior, alone, is insufficient to establish probable cause to support a seizure for a mental health evaluation. *Cloaninger*, 555 F.3d at 333 (citing *Bailey v. Kennedy*, 349 F.3d 731, 740 (4th Cir. 2003)). Taken in the light most favorable to Cardwell, Cardwell's actions when the deputies arrived at his home, which included asking the deputies their names and giving a "speech" about veterans' issues, did not rise to the level of additional indicia of probable cause to effect a mental health seizure.

Moreover, the *Graham* factors weigh in favor of a finding that the force used to effect the seizure was excessive. Even assuming that the facts and circumstances confronting the deputies supported a genuine concern that Cardwell posed an immediate threat, Cardwell was committing no crime, Cardwell contends that he was not resisting or attempting to flee, and in fact that he remained polite and courteous throughout the encounter, even after he had been body-slammed on the driveway. While "[e]ven purely passive resistance can support the use of some force, [] the level of force an individual's resistance will support is dependent on the factual circumstances underlying that resistance." *Bryan v. MacPherson*, 630 F.3d 805, 830 (9th Cir. 2010). Particularly in the context of a mentally unstable individual who is unarmed and minimally threatening, it is

apparent that law enforcement officers must try to deescalate the situation and "adjust the application of force downward," rather than escalating the situation by applying undue force. *Estate of Armstrong ex rel. Armstrong*, 810 F. 3d 892, 900 (4th Cir. 2016) (citing *Martin v. City of Broadview Heights*, 712 F.3d 951, 962 (6th Cir. 2013)). Here, viewing the facts in the light most favorable to Cardwell, and even assuming that Cardwell appeared to the deputies to be mentally unstable and to pose a threat, Cardwell was offering little or no resistance and was not armed, and the amount of force used to seize him was excessive.

Defendants deny that Deputy Knight was present at the Cardwell incident, and argue that instead an intern had ridden along with defendants Kehagias and Klingman. Because whether Knight was present is in in dispute, the Court will allow Cardwell's claims to go forward against Knight at this time.

The Court recognizes that the existence of probable cause for a mental health seizure is not easily reduced to bright-line rules, but holds that, on this evidence, it should have been clear to the deputy defendants that they lacked probable cause to detain Cardwell. *Goines*, 822 F.3d at 170 (where individual exhibits no signs of mental illness and makes no threats to harm himself or others, no probable cause for emergency mental-health detention). Further, it was plainly clearly established that use of force which would result in a broken hip and rib as well as deployment of a full can of pepper spray to the face of an individual who is not resisting would be excessive. *See, e.g., Geba v. Norris*, No. 2:14CV612, 2016 WL 8730898, at *6 (E.D. Va. Apr. 4, 2016) ("Tackling a stationary individual, who is not resisting arrest or attempting to flee, constitutes excessive force in violation of the Fourth Amendment.").

22

3. Tyrone Bethune and Ryan Holloway.

When viewed in the light most favorable to them, the facts supporting plaintiffs Bethune and Holloway's claims demonstrate that Kehagias violated their constitutional rights to be free from unreasonable seizure and excessive force. The defendants' proffered facts which would support Kehagias' probable cause to enter Bethune's home, including whether he had knowledge of Bethune's outstanding arrest warrant and whether he smelled the odor of marijuana when he was standing at the door, are hotly contested by plaintiffs. Absent any right to arrest or seize Bethune or Holloway, Kehagias lacked the right to use any force against either plaintiff. *See Saucier*, 533 U.S. at 208.

Moreover, plaintiffs' version of events would demonstrate that, even if their seizure was reasonable, the *Graham* factors weigh in their favor and the amount of force used was not objectively reasonable, as plaintiffs contend that Bethune was body-slammed face first into the porch and Holloway was slammed into the porch railing though neither was resisting or attempting to flee. *See, e.g., Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994) (plaintiff may pursue excessive force claim even where unreasonable detention claim is weak). Deputies Kehagias and Werbelow arrived at Bethune's home attempting to serve a warrant on Robert Cox, and Bethune explained to Kehagias that they had the wrong address and that the addresses on that road were confusing. Although neither Bethune nor Holloway offered any physical resistance during the encounter, and there is no indication that either Bethune or Holloway was armed or in some other way known to the deputies to be dangerous, both were slammed into the porch resulting in injuries. While Bethune and Holloway's injuries were minor, this is but one factor to be considered in determining whether the force employed was excessive, and law enforcement "officers will not be absolved of liability merely because their conduct, however unreasonable, results in only *de*

*minimis* injury." *E.W. by & through T.W. v. Dolgos*, 884 F.3d 172, 185 (4th Cir. 2018). Because a jury could conclude, based upon the facts viewed as they must be at this stage, that Kehagias' use of force against Bethune and Holloway was excessive in light of the facts and circumstances, summary judgment in favor of defendants is not appropriate.

Defendants have further argued that it was Deputy Thomas who performed the take-down of Bethune, but Bethune contends that he knows Kehagias and knows that it was Kehagias who grabbed him, slammed him on the porch, and handcuffed him. Because whether Kehagias effected Bethune's seizure is in dispute, the Court will allow Bethune's claim against Kehagias to proceed at this time.

Defendants in their brief argue that it would not have been clearly established that Kehagias would have violated Bethune and Hollow's constitutional rights if it is found that Bethune was actively resisting or that there was probable cause to believe a crime was being committed based on the odor of marijuana and Kehagias' knowledge of Bethune's outstanding arrest warrant. Because the facts relied on by defendants to argue that the rights violated were not clearly established are in dispute, defendants have not, based on plaintiffs' version of the facts, satisfied their burden to show that the right to be free from arrest without probable cause and free from excessive force under these circumstances would not have been clear to a reasonable officer. *See Henry*, 501 F.3d at 378.

4. Wesley Wright.

Plaintiff Wright alleges that defendant Kehagias unjustifiably entered his home without a warrant, that Wright's seizure was unreasonable, and that defendant Kehagias used excessive force when arresting him. Defendants have not argued that they are entitled to qualified immunity as to any entry into Wright's home, and thus this claim may proceed to trial. As to Wright's seizure,

cursing at or criticizing an officer while he is performing his duty cannot form the basis of a charge of resist, delay, obstruct, and thus any comment made by Wright when he came out on to the porch and then went back into the house cannot support the RDO charge filed against him. *See State v. Allen*, 14 N.C. App. 485, 491 (1972). Thus, the basis for that charge, if any, must have arisen during Kehagias' physical altercation with Wright.

Defendants contend that the force utilized by Kehagias in arresting Wright was objectively reasonable because Wright was verbally and physically abusive and non-compliant. Viewing the facts in the light most favorable to Wright, however, does not support such a finding. Wright's testimony depicts that he was sitting inside his home when Kehagias commanded that the door be unlocked, entered the house without consent and without a warrant, grabbed Wright, and dragged him outside into the yard, slamming Wright's body against the railings as he proceeded. Wright testified that Kehagias used not one but two cans of pepper spray directly in Wright's face for a prolonged period. Wright contends that he was not resisting Kehagias at any time.

The *Graham* factors again weigh against a finding that summary judgment is appropriate as to the reasonableness of the amount of force used against Wright. The information provided to Kehagias as indicated by the CAD report was that Wright was not armed and that no weapons were in the home. Upon Kehagias' arrival, Wright was not engaged in any active conflict with Scott or anyone else, and Scott informed Kehagias that everything was fine and Wright was inside watching television. Although Wright came out of the house and yelled something to Scott, even if what he yelled was interpreted as being directed at Kehagias, there is nothing to support that what Wright said would indicate that he was a threat to the safety of Kehagias or others. The severity of the crime at issue, a domestic disturbance call that involved only verbal abuse, cuts in Wright's favor, especially in light of Scott's statement to Kehagias on his arrival that things had settled down.

25

Finally, Wright's detailed description of events does not reveal that he was resisting or attempting to evade Kehagias by fleeing when he was dragged out of his home and repeatedly pepper-sprayed.

Again, the rights alleged by Wright to have been violated were clearly established at the time of this incident. Viewing the facts in the light most favorable to Wright, Kehagias' actions were "such an obvious violation of the Fourth Amendment's general prohibition on unreasonable force [and seizure] that a reasonable officer would not have required prior case law on point to be on notice that his conduct was unlawful." *Jennings v. Jones*, 499 F.3d 2, 17 (1st Cir. 2007); *see also Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 543 (4th Cir. 2017) (right may be clearly established if general constitutional rule applies with obvious clarity or is manifestly apparent from broader applications). Defendants have not argued any cases contrary to this finding in their brief, and have failed to satisfy their burden to show that the rights alleged to have been violated were not clearly established.

5. Estate of Livingston

Plaintiff Estate of Livingston alleges that defendant Kehagias unlawfully entered Livingston's home and arrested him, that Kehagias used excessive force in effecting Livingston's arrest, and that Kehagias was unjustified in using deadly force against Livingston. The Court holds that Livingston has established that his Fourth Amendment rights to be free from unreasonable seizure and excessive force were violated and that the rights as they existed in these circumstances were clearly established.

Viewing the facts in the light most favorable to Livingston, defendant Kehagias was without justification in his warrantless entry into Livingston's home and arrest of Livingston. Defendants have argued that Kehagias was justified in entering Livingston's home without a warrant because there was probable cause to believe that Livingston had committed the crime of

26

resist, delay, obstruct when he lied to Kehagias about whether there were any other people in the house. Defendants further argue that Kehagias had probable cause to arrest Livingston for assaulting an officer when Livingston closed the door and the door struck Kehagias' foot which was in the doorway.

According to plaintiffs' version of events, however, when Livingston opened the door, Kehagias asked if Lonnie Setzer was in the house, and Livingston replied "no." [DE 112-49] Carroll Dep. at 45-46; [DE 95-7] Edge Dep. at 55; [DE 96-9] Timmerman Dep. at 58. Kehagias asked if he could come inside to look, and Livingston responded that he could not unless he had a warrant and began to close the door. *Id.* At that point, Kehagias' foot was either in the doorway and the door hit his foot as it was closing or Kehagias was entirely on the porch and kicked the door open just before it came to a close. *See* Timmerman Dep. at 68; 71-72; Edge Dep. 64-65. Under either scenario, Kehagias' entry into the home, either by a few inches with the toe of his boot or by kicking open the door before it closed, was unlawful.

If Kehagias' foot was in the doorway blocking the door from closing, such that the door would strike his foot if it was closed, this intrusion was a violation of the Fourth Amendment. *See Kyllo v. United States*, 533 U.S. 27, 37 (2001) (Supreme Court has "made clear that any physical invasion of the structure of the home, 'by even a fraction of an inch,' [is] too much") (citation omitted)). Even if Kehagias' foot was placed in the doorway *after* he believed that Livingston lied about the identity or number of occupants in the house, and thus believed he had probable cause to arrest Livingston for resist, delay, obstruct, he cannot show exigent circumstances which would support the presumptively unreasonable warrantless intrusion. Kehagias was allegedly at Livingston's home looking for a person who may have been involved in a misdemeanor crime, and the crime that Kehagias believed Livingston had committed was also a misdemeanor;

27

defendants have failed to come forward with any evidence or persuasive argument that would rebut the presumption of unreasonableness of a warrantless invasion of Livingston's home to pursue minor charges. *See Welsh*, 466 U.S. at 750; *see also* [DE 112-44] SBI 30(b)(6) Dep. at 245 ("we couldn't find an articulation that [Kehagias] had a legal right to enter Mr. Livingston's residence."]. In the absence of a valid justification for his warrantless entry, Kehagias' seizure of Livingston violated his constitutional rights as did any subsequent use of force. *See Bailey v. Kennedy*, 349 F.3d 731, 743 (4th Cir. 2003); *Graham*, 490 U.S. at 396 (right to use some degree of physical coercion arises with right to make arrest or investigatory stop).

Even assuming, *arguendo*, that Kehagias' entry into Livingston's home to effect an arrest was reasonable, the evidence when viewed in the light most favorable plaintiffs supports that the force used was unreasonable under *Graham*. First, the severity of the crime at issue, a misdemeanor, was minor. Second, there is no indication in plaintiffs' evidence that Livingston posed an immediate threat to Kehagias. None of the evidence submitted by plaintiffs shows that Livingston attacked or assaulted Kehagias during the course of their encounter. Prior to being forcibly taken down to the ground by Kehagias, Livingston had offered no resistance whatsoever. "Tackling a stationary individual, who is not resisting arrest or attempting to flee, constitutes excessive force in violation of the Fourth Amendment." *Geba v. Norris*, No. 2:14CV612, 2016 WL 8730898, at *6 (E.D. Va. Apr. 4, 2016); *see also Sloan*, 868 F. Supp. 2d at 541 (listing cases holding same).

After Kehagias had taken Livingston to the ground in an attempt to arrest him, plaintiffs' evidence reveals that Livingston refused to give up his hands to be handcuffed. As noted above, while passive resistance may justify the use of some force, *Bryan*, 630 F.3d at 830, plaintiffs' evidence supports that there was no active resistance by Livingston. In response to Livingston's

refusal to make his hands available for the handcuffs, Livingston was elbowed in the head so that his head hit the tile floor and began to bleed, was threatened with Kehagias' firearm, tased, and pepper sprayed in the face by defendant Werbelow. In considering the circumstances confronting the deputies and the moment the force was deployed inside Livingston's home, the force used by defendants Kehagias and Werbelow was excessive. *See, e.g., Thomas v. Holly*, 533 F. App'x 208, 219 (4th Cir. 2013) (repeatedly punching suspect in the head when he posed no immediate threat but refused to be handcuffed was objectively unreasonable violation of clearly established right to be free from deadly force). Moreover, this circuit has "stated in forthright terms that 'officers using unnecessary, gratuitous, and disproportionate force to seize a secured, unarmed citizen, do not act in an objectively reasonable manner and, thus, are not entitled to qualified immunity.'" *Meyers v. Baltimore Cty., Md.*, 713 F.3d 723, 734 (4th Cir. 2013) (citing *Bailey v. Kennedy,* 349 F.3d 731, 744–45 (4th Cir.2003)).

The same analysis applies to the encounter as it progressed on to the porch, where Livingston was dragged by Werbelow and Kehagias and where he continued to be tased and was ultimately shot and killed by Kehagias. Defendant Kehagias argues that Livingston had taken control of the taser and had in fact tased Kehagias before Kehagias retrieved his gun and shot Livingston. Deadly force may only be employed where the officer has sound reason to believe that the suspect poses a serious threat of physical harm. Further, "force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated." *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005).

Viewing the facts in the light most favorable to the plaintiffs, Livingston appears to have touched the taser in an attempt to remove it from his body but he did not possess control of it nor did he tase defendant Kehagias. *See* [DE 112-49] Carroll Dep. at 125; [DE 112-46] Timmerman

Dep. at 231-33. Considering this evidence and the appropriate *Graham* factors, Kehagias did not have sound reason to believe that Livingston posed a serious threat of physical harm, and his use of deadly force was therefore unreasonable.

The Court further holds that Livingston's rights to be free from unlawful entry and seizure and from excessive force, including deadly force, were clearly established in November 2015. As noted above, it was well established in 2015 that unnecessary, disproportionate force used to seize an unarmed individual for a minor offense is plainly unreasonable. Although defendants rely on *Estate of Armstrong*, 810 F.3d at 909-10, which established in 2016 that a taser may not be deployed "in the face of stationary and non-violent resistance to being handcuffed," to argue that the rights alleged to have been violated were not clearly established, the force utilized by Kehagias and Werbelow during the Livingston encounter was not limited to deploying a taser. Indeed, the circuit court has "cautioned [lower] courts against using a segmented view of the sequence of events where each distinct act of force becomes reasonable given what the officer knew at each point in the progression." *Yates v. Terry*, 817 F.3d 877, 883 (4th Cir. 2016) (internal quotation, alteration, and citation omitted). Considering all of the facts with an eye toward the proportionality of the force used, *Smith*, 781 F.3d at 101, the Court concludes that Livingston's right to be free from excessive force in a circumstance involving a minor crimes and no active resistance, and where plaintiffs' evidence establishes that defendant Kehagias "took an unreasonably aggressive tack that quickly escalated . . .", was clearly established. *Id.* at 103.

In sum, the Court holds that the individual deputy defendants are not entitled to qualified immunity as to any plaintiff. "While a jury could well believe the evidence forecast by the Deputies, . . . the 'question of immunity is separate from the merits of the underlying action . . .'".

30

*Hensley* 876 F.3d at 579–80 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 528-29 (1985)). The motion for summary judgment on the defense of qualified immunity is therefore denied.

Section 1983 official capacity claims and *Monell* liability

Municipal liability only results "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). Both acts and omissions may give rise to *Monell* liability, but "omissions are actionable only if they constitute 'tacit authorization' of or 'deliberate indifference' to constitutional injuries." *Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983).

> A policy or custom for which a municipality may be held liable can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that 'manifest[s] deliberate indifference to the rights of citizens'; or (4) through a practice that is so 'persistent and widespread' as to constitute a 'custom or usage with the force of law.'

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999)).

The deficient training and condoned custom theories are alternative methods of establishing *Monell* liability. *Spell v. McDaniel*, 824 F.2d 1380, 1391 (4th Cir. 1987). Where lack of training is "so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need . . . the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989).

"Municipal fault for allowing such a developed 'custom or usage' to continue requires (1) actual or constructive knowledge of its existence by responsible policymakers, and (2) their failure,

as a matter of specific intent or deliberate indifference, thereafter to correct or stop the practices." *Spell*, 824 F.2d at 1391. Knowledge and indifference may be "inferred from the extent of employees' misconduct[,] but [s]poradic or isolated violations of rights will not give rise to *Monell* liability; only widespread or flagrant violations will." *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 402–03 (4th Cir. 2014) (internal quotations and citations omitted). Under both theories, a plaintiff must show not only the existence or omission of a policy or custom, but also that such policy or custom, or lack thereof, was the "moving force" behind the specific constitutional violation alleged. *Milligan v. City of Newport News*, 743 F.2d 227, 230 (4th Cir. 1984).

While the Court recognizes that establishing *Monell* liability is "no easy task," *Owens*, 767 F.3d at 402, it finds that there exists on this record genuine issues of material fact such that summary judgment is not appropriate. Plaintiffs have proffered evidence that the Harnett County Sheriff's Office failed to keep accurate statistics regarding use of force by its deputies and the number of resist, delay, and obstruct charges which were filed. Defendant Knight, who served as patrol sergeant of the D-Squad, on which defendants Kehagias and Klingman also served, did not keep any statistics regarding uses of force or charges of resist, delay, obstruct by members of the D-Squad, and did not know what the "upper echelon" did with use-of-force reports. [DE 112-63] Knight Dep. at 105. During its Rule 30(b)(6) deposition, the Harnett County Sheriff's Office explained that it had no early warning or detection systems in place concerning patterns of behavior by deputies in 2015. [DE 112-61] HCSO 30(b)(6) Dep. at 166; 172. Plaintiffs' police procedure experts have opined that the absence of review procedures for use-of-force incidents and charges of resist, delay, obstruct would result in the Sheriff and other superiors failing to identify and

address potentially overly aggressive deputies. [DE 112-35] Tucker Rep. at 9-10; [DE 112-36] Henley Rep. at 14.

Statistics that were generated by the Harnett County Sheriff's Office reveal that Deputy Kehagias issued more resist, delay, obstruct charges than any other deputy in 2014 and 2015, and that the D-Squad issued more resist, delay, obstruct charges than any other squad. [DE 112-61] HCSO 30(b)(6) Dep. at 100. Although Kehagias made more resist, delay, obstruct charges than any other deputy, he stated that he never went to court and testified against someone whom he had charged with resist, delay, obstruct. [DE 112-65] Kehagias Dep. at 215. The failure of a deputy to appear for a scheduled court date would often lead to the District Attorney's office dismissing the charges. [112-68] Stewart Dep. at 42-43. Indeed, the resist, delay, obstruct charges filed by Kehagias against plaintiffs Wright and Cardwell were dismissed, as was the resist, delay, obstruct charged filed against plaintiff Broom due to defendant Klingman's non-appearance. [DE 112-10]; [DE 112-37] Wright Dep. at 44; [DE 112-43] Cardwell Dep. at 174. Use of force statistics were not maintained or available for production by the Harnett County Sheriff's Office, but Sheriff Coats indicated that he did not dispute reports by a local newspaper which indicate that Kehagias used more force than any other deputy while he was a deputy sheriff. [DE 112-61] HCSO 30(b)(6) Dep. at 114-131; [DE 112-67] Coats Dep. 108; [DE 112-26] Mandy Locke, In Harnett, leaders shrugged at complaints, News and Observer, May 3, 2016.

Although evidence of statistics alone will not support municipal liability under *Monell*, *see e.g. Johnson v. Holmes*, No. 3:16CV00016, 2017 WL 4707463, at \*9 (W.D. Va. Oct. 19, 2017), plaintiffs here have presented, in addition to statistics, five incidents which occurred within one calendar year which, if proven, tend to show the Sheriff of Harnett County failed, as a matter of specific intent or deliberate indifference, to correct flagrant violations of citizens' constitutional

33

rights by a group of deputies, in particular by Deputy Kehagias. If the defendant-deputies' conduct was not pursuant to a custom, a reasonable jury could conclude that such conduct was the result of a woeful failure to train that was so likely to result in constitutional violations that the Sheriff should be liable. Further, sufficient evidence has been presented such that it is properly a question for the jury in this case whether the appropriate nexus required between the policy or custom and the injuries sustained by the plaintiffs is present. *See, e.g., Spell*, 824 F.2d at 1392-95; *Bielevicz v. Dubinon*, 915 F.2d 845, 854 (3d Cir. 1990).

The Court finds that on this record it is appropriate to allow plaintiffs' theories of both condoned conduct and of failure to train to proceed to trial.

State law claims

Because the Court has denied summary judgment in defendants' favor on qualified immunity as to the Fourth Amendment claims, the Court denies summary judgment in defendants' favor on public officer immunity and allows plaintiffs' state law claims arising from the alleged Fourth Amendment violations to proceed. *See Cooper v. Sheehan*, 735 F.3d 153, 160 (4th Cir. 2013) (citing *Rowland*, 41 F.3d at 174) (merits of battery, gross negligence claims tied to reasonableness of officers' actions, and thus go forward with excessive force claims); *Bailey*, 349 F.3d at 745 (assault and battery claim available if officer used excessive force); *Beroth Oil Co. v. Whiteheart*, 173 N.C. App. 89, 99 (2005) (absence of probable cause element of malicious prosecution claim). The Court further finds that, on its review of the record, genuine issues of material fact remain as to plaintiff Cardwell's civil conspiracy claim and plaintiff Estate of Livingston's wrongful death claim, and these claims will also proceed.

## CONCLUSION

Accordingly, for the foregoing reasons, defendants' motion for summary judgment [DE 92] is DENIED. The clerk is DIRECTED to refer this matter to the appropriate United States Magistrate Judge for pretrial conference.

SO ORDERED, this _12_ day of July, 2018.

Terrence W. Boyle
TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE